The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner Hedrick and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. However, the Full Commission modifies the Opinion and Award with regard to the issue of non-cooperation with vocational rehabilitation.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as
 STIPULATIONS
1. On 26 July 1993, the date of plaintiff's injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. On 26 July 1993, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant.
4. Plaintiff's average weekly wage was $500.00.
5. Since his injury, defendant has continued to pay plaintiff temporary total disability compensation at the rate of $335.35 per week.
6. A notebook containing copies of plaintiff's medical and vocational rehabilitation records, marked as Stipulated Exhibit Number Two, is admitted into evidence.
7. The depositions of Tally E. Lassiter, M.D., Thomas S. Baldwin, Ph.D., Maria Halpin, M.Ed. and Raymond Kurt Nichols are admitted into evidence.
***********
The Full Commission adopts and modifies the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-eight years old. He had a fifth grade education, but was unable to read or write. Nevertheless, he was intellectually capable of completing a welding course of nine months duration in order to become a certified welder. Plaintiff's employment history consisted primarily of work as a welder. Plaintiff resided in Vanceboro, North Carolina. Vanceboro is approximately twenty-five miles from Greenville, North Carolina and thirty-seven miles from Farmville, North Carolina. Plaintiff possessed a valid North Carolina driver's license and was capable of driving an automobile.
2. Defendant periodically employed plaintiff as a welder over a period of approximately ten years. While working for defendant on 26 July 1993, plaintiff slipped and fell thereby sustaining a herniated disc at L4-L5. Plaintiff's herniated disc was treated surgically by Dr. Lassiter on 7 October 1993 and 9 November 1995.
3. On 10 January 1996, plaintiff underwent a functional capacity examination (FCE). He also underwent four sessions of work hardening therapy. During the FCE and work hardening therapy, plaintiff consistently exhibited excessive self-limiting or inconsistent behaviors. Despite his submaximal effort, he demonstrated that he was capable of functioning in the light to medium work categories. His condition does require that he have an opportunity to change positions from sitting to standing.
4. On 29 January 1996, Dr. Lassiter released plaintiff to return to light duty work. He restricted plaintiff from lifting weights greater than twenty-five pounds. He also restricted him from extended walking, sitting or standing for more than two hours without a break. He permitted plaintiff to perform limited bending, stooping and squatting. For the first four weeks plaintiff was restricted to working four hours per day. For the next four weeks he was restricted to working for six hours per day. He was then permitted to return to work for eight hours per day. Plaintiff was physically capable of performing work with physical demands consistent with the restrictions assigned by Dr. Lassiter.
5. Plaintiff reached maximum medical improvement on 11 March 1996. However, as of that date, he had not reached maximum vocational improvement. Dr. Lassiter rated plaintiff as having a fifteen percent permanent impairment of his back as a result of his injury on 26 July 1993. Dr. Miller, from whom plaintiff received a second opinion, concurred with Dr. Lassiter's opinion that plaintiff has a fifteen percent permanent impairment of his back as a result of his injury on 26 July 1993. Plaintiff retains a fifteen percent permanent impairment of his back as a result of his injury on 26 July 1993.
6. In May 1996, defendant retained the services of Resolve Rehabilitation Consultants to provide plaintiff with vocational rehabilitation and job placement assistance. Throughout the period of time that Resolve Rehabilitation Consultants provided plaintiff with vocational rehabilitation and job placement assistance, plaintiff stubbornly resisted the efforts being made to assist him in returning to work. Plaintiff repeatedly failed to contact numerous potential employers identified for him by his vocational counselors. Very frequently when his counselors attempted to reach him by telephone they were informed that he was away or no one answered the telephone call. Plaintiff's non-cooperative behavior and disinterest in vocational assistance was egregious in nature.
7. In September 1996, Maria Halpin was assigned to assist plaintiff in returning to work. Plaintiff informed Ms. Halpin that he did not believe he could maintain a job due to his constant pain. He also stated that he believed the restrictions imposed by Dr. Lassiter were too lenient. Ms. Roach, plaintiff's girlfriend, reinforced plaintiff's complaints. Ms. Roach actively advocated that plaintiff could not return to work thereby interfering with his vocational progress.
8. Although defendant offered to provide plaintiff a means to increase his literacy, plaintiff nevertheless refused defendant's offer to provide him with remedial literacy instruction. Plaintiff's effort to obtain employment was poor at best. In fact, at times, plaintiff reported that he had completed employment applications when he had not done so. On more than one occasion, he reported to Ms. Halpin that prospective employers had no employment available. However, when Ms. Halpin contacted these same employers to confirm her understanding that they had employment available, the employers contradicted plaintiff's assertion that they had no available positions.
9. On more than one occasion, plaintiff appeared for an employment interview using a cane to ambulate. Dr. Lassiter did not believe that plaintiff required the assistance of a cane to ambulate. Plaintiff used a cane without medical necessity to purposefully sabotage his employment interviews in a continuation of his blatant non-cooperation with vocational rehabilitation efforts.
10. In November 1996, Ms. Halpin located a potential position for plaintiff as an unarmed security guard. The physical requirements of the position were classified as sedentary. The physical demands of the position were within the restrictions imposed by Dr. Lassiter. Dr. Lassiter specifically approved of plaintiff returning to work in the security guard position. However, when plaintiff attended the employment interview, he was dressed inappropriately, wearing a hat, sunglasses and a shirt that was not tucked in. During the interview he exaggerated his physical restrictions. Ms. Roach, who accompanied plaintiff to the interview, expressed her opinion that plaintiff was incapable of working as a security guard. Ms. Roach, who was also inappropriately dressed, wore a halter top to the interview. During the interview, Ms. Roach attempted to engage Ms. Halpin in a verbal dispute. Plaintiff and Ms. Roach purposefully sabotaged plaintiff's interview by behaving inappropriately and giving statements regarding plaintiff's ability which are clearly inconsistent with Dr. Lassiter's recommendations. Plaintiff did not receive an offer of employment as a security guard. It can be inferred that plaintiff's and Ms. Roach's behavior played a large role in the negative outcome of the interview process.
11. Thereafter, Ms. Halpin located potential employment for plaintiff as a cook for a fast food restaurant. The position was available, suitable for plaintiff's physical condition and was specifically approved by Dr. Lassiter. Plaintiff was scheduled to attend an employment interview for this position on 22 October 1996. However, plaintiff failed to attend the interview as scheduled and therefore was not considered for employment. Once again, plaintiff showed disinterest in returning to suitable employment regardless of the efforts on the part of Ms. Halpin, defendant and the potential employers.
12. Ms. Halpin next identified potential employment for plaintiff as an automobile detailer. Dr. Lassiter also approved this position as being within plaintiff's physical restrictions. Plaintiff did not attend the interview appointment and the position was filled before an interview could be rescheduled. Plaintiff's primary duty during the vocational rehabilitation process is to quickly and avidly pursue every legitimate employment possibility. It is clear that plaintiff had a nonchalant attitude at best towards returning to work which in this instance cost him a potential job offer.
13. Ms. Halpin also identified potential employment through Manpower as a packager. Plaintiff failed or refused to apply for the position within one week of the date it was identified for him. Once again plaintiff showed his disinterest in, if not defiance against, any kind of employment.
14. Ms. Halpin also attempted to enroll plaintiff in a sheltered workshop offered by the North Carolina Division of Vocational Rehabilitation. Plaintiff failed to attend the first enrollment interview. He did attend the second enrollment interview, but then declined to enroll in the program. Although sheltered workshop employment may not be suitable employment available in the marketplace, it nevertheless would have benefited plaintiff by helping him develop skills and behaviors for reentry into the workforce. Once again plaintiff refused to take advantage of any vocational rehabilitation offered.
15. Ms. Halpin attempted to enroll plaintiff in a cashier salesperson course offered by Pitt Community College. In addition to training, the course offered job placement assistance. Enrollment in the course was not limited to persons who were able to read and write. The course exam could have been administered orally. Plaintiff did not accept this offer of assistance. Not only was plaintiff not interested in reemployment, he would not even attempt any type of retraining. Plaintiff has refused and even sabotaged almost every form of vocational rehabilitation effort.
16. Ms. Halpin also identified potential employment for plaintiff as a light duty assembler. Dr. Lassiter approved this position as being within plaintiff's physical restrictions. Plaintiff refused to apply for this position because he deemed the work to be suitable only for women. Plaintiff was unreasonable in his refusal to apply for this position and his refusal is merely another attempt to sabotage his chances for a successful return to work.
17. Plaintiff informed Ms. Halpin that he desired to return to work as a welder in a position that was within his physical restriction. Attempting to satisfy plaintiff's vocational interest, Ms. Halpin located potential employment for plaintiff as a spot welder for an employer located in Farmville, North Carolina. Farmville is located approximately thirty-eight miles from Vanceboro, where plaintiff makes his home. Plaintiff declined to apply for this position on the ground that it was too far from his home. No doctor had restricted plaintiff from traveling thirty-eight miles to work. Even when plaintiff's interests were taken into serious consideration, he was still unwilling to even attempt a return to work. Plaintiff had the option to apply for this job; and in the event it was offered to him, attempt it during the nine-month trial return to work period. Had the travel been too much for plaintiff, Dr. Lassiter certainly could have signed a Form 28U certifying that plaintiff's trial return to work had been unsuccessful.
18. On 18 November 1997, Ms. Halpin identified potential employment for plaintiff as a cook's helper for a Bojangles restaurant in Greenville, North Carolina. The position was available on that date and thereafter. The individuals who were responsible for hiring the restaurant's employees knew that plaintiff could perform only restricted light duty work. These persons also knew that plaintiff was illiterate and that his vocational experience consisted primarily of work as a welder. With this knowledge, Bojangles agreed to grant plaintiff an employment interview.
19. Ms. Halpin then attempted to contact plaintiff to inform him of this position's availability and that she had arranged for an employment interview on 25 November 1997. Ms. Halpin unsuccessfully attempted to telephone plaintiff on at least three days prior to 25 November 1997. Finally, she contacted him on 24 November 1997. She informed him of the interview. Plaintiff asked that the interview be rescheduled, stating that he had a cold and a sore throat. Ms. Halpin contacted Bojangles and arranged to reschedule the employment interview for 2 December 1997. On 24 November 1997, Ms. Halpin telephoned plaintiff again to inform his that the interview had been rescheduled for 2 December 1997. She was informed that he was not home. The following day, she was able to contact him and provide him with the date and time for the employment interview. Plaintiff's inaccessibility negatively impacted the vocational rehabilitation process which once again is plaintiff primary duty during his time of disability.
20. Plaintiff appeared for the employment interview on 2 December 1997. At the conclusion of the interview, Bojangles offered to hire plaintiff for the cook's helper position. At that time, Ms. Halpin prepared a written analysis of the physical demands required of a cook's helper. She provided the analysis to Dr. Lassiter for a determination of whether plaintiff was capable of performing the duties required of a cook's helper. However, her analysis and this attempt to return plaintiff to work were blatantly sabotaged by plaintiff who provided Dr. Lassiter with inaccurate information regarding the position.
21. Contrary to the information plaintiff provided to Dr. Lassiter, the duties of a cook's helper did not include unloading trucks, pushing or pulling carts loaded with one hundred pounds or lifting cases of chicken weighing thirty-five pounds. Rather, Bojangles hired employees specifically to unload the trucks that made bi-weekly deliveries to its restaurant. Moreover, Bojangles had in effect a safety rule or policy prohibiting employees from lifting or carrying cases of chicken without the assistance of another employee. Bojangles adopted this rule or policy in an effort to avoid injuries to its employees.
22. Bojangles permits its employees to take periodic breaks from the duties of their positions. Bojangles would have permitted plaintiff to take a break once every two hours. Bojangles permits its employees who smoke cigarettes to take periodic breaks to smoke cigarettes. Bojangles permits its employees to take these breaks in addition to their scheduled breaks. Permitting plaintiff to take a break once every two hours to accommodate the requirement that he be permitted to periodically change position, is not substantially different from permitting nicotine addicted employees to take periodic breaks to satisfy their craving for nicotine. Therefore, to the extent that Bojangles offered plaintiff a position that was modified to accommodate his physical condition, the accommodations were minimal and did not alter the position's character from one that was generally available in the competitive labor market to one that was not available in normal market conditions.
23. Dr. Lassiter approved of plaintiff returning to work as a cook's helper for Bojangles after reviewing Ms. Halpin's accurately prepared analysis of the position's physical demands. On or about 5 December 1997, plaintiff began indicating that he was concerned about his physical ability to perform the duties of a cook's helper, regardless of whether Dr. Lassiter approved his return to work in that position. Plaintiff continued in his stubborn efforts to prevent any chance of a return to work.
24. Bojangles offered plaintiff employment as a cook's helper on 19 December 1997 and 26 December 1997. Bojangles offered plaintiff part-time employment with the opportunity to work full-time. All persons hired by Bojangles have an opportunity for promotion and advancement if they demonstrate motivation, a positive attitude, proper attire, promptness and a strong work ethic. Persons who begin working for Bojangles as cooks have an opportunity to advance to the position of assistant manager.
25. Plaintiff was scheduled to begin work as a cook's helper on 19 December 1997. Plaintiff contacted Bojangles on 18 December 1997 and expressed concern about his ability to perform the duties of a cook's helper. The statements he made during this conversation with the restaurant's manager gave the manager the impression that plaintiff did not want to return to work. Despite receiving notice that he was to begin work on 19 December 1997, plaintiff did not present himself for work on that date. Once again, plaintiff had the opportunity of a trial return to work to discover during a nine month period if his return would be successful. Nevertheless, plaintiff was steadfastly opposed to attempting any means to lessen his disability or to reassimilate him into the workplace. Vocational rehabilitation, no matter how good, can never be successful with constant sabotages and road blocks from a plaintiff who is unwilling to even try to benefit from vocational efforts.
26. When plaintiff failed to begin work as scheduled on 19 December 1997, Ms. Halpin was able to convince Bojangles to permit plaintiff to begin working on 26 December 1997. Ms. Halpin notified plaintiff that he was to begin work as a cook's helper on that date. Plaintiff did not present himself for work on 26 December 1997. Once again plaintiff sabotaged all vocational efforts and displayed disrespect for vocational efforts made on his behalf.
27. The cook's helper position was available on 19 December 1997 and 26 December 1997. The position was generally available in the competitive labor market. Plaintiff was physically, vocationally and intellectually capable of performing the duties of a cook's helper. Plaintiff was able to obtain employment as a cook's helper. Considering plaintiff's age, work experience, education and physical limitations, the cook's helper position was suitable employment for plaintiff.
28. On 19 December 1997 and 26 December 1997, plaintiff unjustifiably refused suitable employment procured for him by defendant. Furthermore, prior to and on those dates, plaintiff's behavior and blatant sabotage tactics which interfered greatly with all vocational rehabilitation efforts were so egregious as to rise to the level of constructive refusal of suitable employment in and of itself. Vocational rehabilitation is a process that must have not only plaintiff's minimal cooperation but an interest on his part. No vocational efforts regardless of the utmost quality can be effective if an injured worker is not interested in a return to work. Therefore, such egregious behavior as in this case must be deemed constructive refusal of suitable employment.
29. Thomas S. Baldwin, Ph.D. testified that plaintiff is permanently incapable of earning wages in the competitive labor market. He arrived at this conclusion by disregarding a medical doctor's opinion. Dr. Lassiter repeatedly expressed the opinion that plaintiff was capable of light duty work. Additionally, Mr. Baldwin arrived at this opinion without the benefit of reviewing or considering plaintiff's vocational rehabilitation records. Therefore, the undersigned gives minimal weight to Mr. Baldwin's testimony.
***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. On 26 December 1997, plaintiff, without justification, refused employment with Bojangles which was suitable to his capacity and procured for him. Therefore, he is entitled to no temporary disability compensation after that date until such time as he affirmatively demonstrates that he has ceased his unjustified refusal. G.S. § 97-32.
2. Moreover, plaintiff's pattern of egregious conduct and his attempts to blatantly sabotage vocational rehabilitation efforts over the period of time between May 1996 and 26 December 1997 rose to not only noncooperation but to the level of constructive refusal of suitable employment certainly by 26 December 1997, if not earlier. Therefore, plaintiff is entitled to no temporary total disability compensation after 26 December 1997 and continuing until such refusal ceases based on his constructive refusal of suitable employment and noncooperation with vocational rehabilitation. G.S. § 97-25 and § 97-32.
3. Although defendant is entitled to suspend payment of temporary total disability compensation effective 26 December 1997, plaintiff was paid benefits after that date. Therefore, defendant is entitled to a credit against any compensation that may become due to plaintiff pursuant to G.S. § 97-31(23) in an amount equal to the temporary total disability compensation paid plaintiff since 26 December 1997. G.S. § 97-18.1 and § 97-42.
4. However, at this time, the amount of future weekly benefits cannot be determined. The future issues of permanent partial disability owed after a deduction of the credit, additional temporary partial owed or additional temporary total benefits owed are reserved. G.S. § 97-31(23), § 97-42, § 97-30 and §97-29.
5. Plaintiff is entitled to payment of all medical expenses incurred as a result of his injury on 16 July 1993 for so long as such evaluations, examinations and treatments tend to effect a cure or provide relief. G.S. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Although defendant is entitled to a credit for the overpayment which occurred during plaintiff's unjustified refusal, the issue of payment of permanent partial disability is unclear at this time since no payment of weekly compensation is due plaintiff.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of his injury on 16 July 1993 for so long as such evaluations, examinations and treatments tend to effect a cure or give relief.
3. Defendant shall pay the costs due the Commission.
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DCS/nwg